Valu also responded. Your Honors, the facts of this case are undisputed and quite simple. Petitioner was a truck driver for 14 years. On October 9, 2007, he was unloading pallets when one of the pallets fell over with eight and a half gallons of apple juice and hit him right in the head, completely undisputed. Petitioner went to Concentra that same day, had a drug test, an alcohol test, and then began treatment. A couple of weeks later, with the Dr. Kautzke out of Elmhurst Orthopedics on October 17, 2007. Dr. Kautzke diagnosed cervical and thoracic spondylosis and radiculitis, as well as some degenerative disc disease that appeared on the x-rays and on the MRIs. At that time, he recommended that Petitioner stop smoking, undergo physical therapy, prescribe some medications, as well as the MRI. As stated just a couple of moments ago, the MRI showed some mild disc degeneration in the cervical spine from C4 through C7, but there was absolutely no spinal cord impingement. So you're proceeding under the theory that the accident aggravated the pre-existing condition, correct? Correct. Absolutely. Dr. Kautzke was treating the Petitioner for a short period of time when he referred him over to Dr. Brown. Dr. Brown is a neurosurgeon with CINN. On January 7, 2008, Petitioner saw Dr. Brown for a thorough evaluation, and Dr. Brown at that time recommended all conservative measures before even considering surgery. Specifically, Dr. Brown stated that an EMG should be considered prior to surgery, because if the Petitioner's complaints were coming from his carpal tunnel, then a cervical surgery would not help at all. Dr. Brown diagnosed mechanical neck pain, and again, maybe carpal tunnel. Petitioner does have a history dating back to 2001 of carpal tunnel syndrome. Petitioner continued to treat with therapy. February 7, 2008 was his last therapy session, and at that time he was noted to be medium duty below the shoulders, light duty above the shoulders. Respondent, he had a Section 12 exam with Dr. Kornblatt on February 11, 2008. Dr. Kornblatt is an orthopedic, board certified orthopedic surgeon with Illinois Bone & Joint. He also diagnosed cervical strain and aggravation of a pre-existing degenerative condition. Dr. Kornblatt, under no uncertain terms, said that clinically, no surgery is indicated. In fact, surgery is contraindicated. He stated that, in his opinion, the Petitioner should return to his normal lifestyle as soon as capable. He should do aerobic activities, upper extremity strengthening, and cervical range of motion. He indicated that Petitioner should return to work in a light duty capacity, no lifting more than 25 pounds, and alternating positions for four weeks, and then return to work in his full duty capacity. February 27, 2008, Dr. Kalski recommends surgery. Despite the fact that two days earlier, on February 25, 2008, Petitioner had a second epidural with a good result. The employer could accommodate the light duty restrictions. Petitioner got a letter to this effect and testified during his testimony that he did receive the letter and he knew that the employer was able to accommodate these restrictions. Yet, Petitioner did not return to work in any way. Well, rather than just going through the entire history, one of the issues they're arguing is that no TTP benefits should be awarded after February 12, 2008, because he had reached MMI. Correct. So what's your argument? What evidence can you call our attention to that refutes that argument? Dr. Kornblatt's exam is very thorough and his report is very detailed. In his report, he states that Petitioner did sustain a cervical strain and an aggravation of his degenerative disc disease. However, by the time he saw him, he had reached maximum medical improvement. No further care was necessary with the exception of these home exercise programs and to resume his normal life activities as soon as possible. Why shouldn't we just view this as a run-of-the-mill disagreement between Kornblatt and Kalski, and the Commission chooses to credit Kalski instead of Kornblatt? That is exactly what this case is not about, Your Honor. With all due respect, the Commission decision is clearly against the manifest way to the evidence. They disregarded the evidence as a whole. If it were a case of Kalski versus I and E doctor and they made their decision, quite frankly, I don't think I would be here today. However, Dr. Brown is part of this. Petitioner's testimony is part of this. The physical therapy record, as well as Dr. Kalski and Dr. Kornblatt, all of the evidence needs to be considered as a whole, and that's what the Commission failed to do. Well, what, how does Brown help you? Because Brown does say, oh, hey, if you're going to get surgery, come back to our shop, you know, after Effie says, let's try conservative treatment. Dr. Brown made it very clear, again, he is a neurosurgeon, he made it very clear that Petitioner needs to undergo all conservative measures before even considering surgery. Dr. Brown did not state in his report that Petitioner is a candidate for surgery. He insisted on conservative measures. He told that to Petitioner, and Petitioner even admitted in his own testimony that Dr. Brown did say all forms of conservative measures need to be undergone. So you're saying he did not claim it, did not exhaust all forms of conservative treatment? He did not exhaust all forms, and more importantly, the EMG is key. Petitioner's complaints have to do with the numbness and tingling in his hands. Dr. Brown very specifically put in his report that an EMG should be considered prior to surgery because if the Petitioner and he goes on to state, because if the Petitioner has surgery or doesn't have the EMG and has surgery and his complaints are really related to the carpal tunnel, the surgery is not going to do anything. Well, but aren't his complaints more than just his hands? Hands and range of motion of his neck. Well, doesn't that somehow just, does a layman suggest that there's something, some cervical factor involved here when we're talking range of movement? Range of motion is a subjective complaint, as is pain. And Petitioner's complaints of pain, as well as his range of motion, are the problematic areas, for lack of a better word. If you look at his progression from the start of physical therapy, where he was sedentary to the end of physical therapy, where his restrictions were light to medium, again, light above the shoulders and medium below the shoulders, he was making progress. His diagnostic tests, his MRIs, his x-rays showed some degeneration, but no spinal cord impingement, no bulging discs, no herniated discs. In fact, in Dr. Kornblatt's report, it indicates that when he was testing his range of motion of his lumbar spine, his neck extension was fine, but when he tested his cervical range of motion, I believe he stated that he didn't move his neck more than 5 or 10 degrees in any direction. But yet, when he tested his lumbar, his neck did extend more, so. Well, I have a question about that. And again, I'm certainly not a physician, but when you're talking about lumbar range of motion, right, your head is stationary, isn't it? That's what I had thought until I read his report. So apparently, the Petitioner did extend his neck back, and it was enough for the doctor to comment on it. Did Dr. Brown rule out surgery as a treatment option in all events? He indicated that if he is to consider surgery, he needs to exhaust all conservative methods first. So at the time he saw him, did he absolutely rule out surgery? No. Did he say he is a surgical candidate at that time? No. All right. Wasn't there evidence through the testimony of the claimant that he was, with these conservative methods, he was not feeling better? The conservative methods were minimal, they were short-lived, his overall condition continued to deteriorate. And he underwent an extensive regimen of conservative treatments after Dr. Brown issued his recommendation, didn't he? He underwent cervical injection. He never underwent the EMG test, and he stopped, he ceased with physical therapy after that. Couldn't that commission find it to be some evidence of the necessity of a surgery? The commission specifically noted in their decision that Dr. Brown did not foreclose surgery. The burden of proof is on the Petitioner to show that he did need surgery at that time. When you take the evidence as a whole, including Dr. Cormlett, Dr. Brown's opinion and Petitioner's progression, his objective progression in his therapy, then I think it's clear that the manifest weight of the evidence shows that surgery, in fact, was not warranted. And the progression you're saying is showing he was getting better? The progression in the physical therapy notes, he starts off with sedentary and ends up with That is some sort of progress. In addition, his subjective complaints of pain in his therapy records, I believe, started at an 8 out of 10 and ended up with a 4 out of 5 out of 10. Okay, but his job involves driving, am I correct? Correct. And the record would support the commission's finding that he has limited, well, there's evidence there, that he has a limited range of motion of his head, which is obviously going to be an impairment of his driving, to some extent, possibly. And he's also on a narcotic. Now, is narcotic a conservative treatment? Narcotic is considered, I believe in my opinion, I'm not a doctor, a conservative mode of treatment. However, their narcotic medication, if you look through the medical records, was given to him PRN, as needed. Petitioner in, I believe it is Dr. Brown's report, indicates that the Vicodin was not taken on a daily basis because it did upset his stomach. The other medication was an anti-inflammatory and I believe a muscle relaxer of some sort, but there was only one narcotic prescribed. With return to work, they weren't returning him to return to work as a truck driver. His truck driving capabilities had to be, I believe, medium to heavy. When he was returned to work in the light duty, they were going to accommodate those restrictions. Petitioner testified, and it's in the physical therapy notes, that he felt he could not turn his neck and he did not feel safe driving, and that he drove himself to all the physical therapy, I believe in excess of 20 physical therapy visits, and would pick up, in the physical therapy notes it indicates he would pick his kids up from school. The physical therapist is the one who mentioned, as well as Kautsky in one of his reports, that Petitioner did not feel safe driving in that condition. Now, there is possibly a difference in driving. What type of truck does he drive? He drives, I believe he drives a semi-truck. He does the deliveries for Juul. The commission was in error when it said that the Petitioner indicated his wife drove him to see Dr. Kornblatt and all of his medical appointments with Dr. Kautsky? Pardon me? And all of his medical appointments with Dr. Kautsky? They were wrong when they said that? No, he drove himself to all the physical therapy visits, 20 plus physical therapy visits. I'm not challenging the fact that his wife drove him to another province. I'm still stuck on the question I asked you before. I don't see where the commission missed any of these facts. They went through it in great detail, and then on page 4 of their opinion said the commission relies on Dr. Kautsky's opinion. The commission finds that Dr. Kornblatt's opinions are not persuasive. Kornblatt's opinions are contrary to the Petitioner's treating physician's opinions, as well as the physical therapist's opinions. So why isn't this a run-of-the-mill Kautsky versus Kornblatt case? Again, I feel that the commission did not consider all the evidence. I think it is very important to note that Kautsky is the one who referred Petitioner to a neurosurgeon, Dr. Brown, and didn't take his findings into consideration. And in fact, the first time Petitioner returned back to Kautsky after seeing Dr. Brown, Dr. Kautsky in his notes indicate that he did not have his notes, but the cervical epidural injection for the Petitioner's information passed along from Dr. Brown seemed reasonable. So Dr. Kautsky is one piece of the puzzle, and I don't believe the commission looked at the totality of the evidence, which included the other doctors. And I think that's very important, because I don't think Dr. Kautsky's, the information that the commission pulled from Dr. Kautsky is not accurate in the sense that they did not look to all of the other evidence in the record. I think in finding specifically that surgery was warranted and writing an award for surgery is egregious in terms of the record as a whole. When you look at the record as a whole, the only one who keeps pushing for surgery is Dr. Kautsky, and he starts that at visit number three. He's pushing, but isn't it supported by the claimant's testimony that his condition was not really improving? I mean, isn't that in the record? The claimant does testify that he feels that his condition is not improving, yet the medical evidence shows otherwise. Now, according to your doctor, you're quoting the claimant's doctor. According to Kautsky, who pushed for surgery from visit three on, correct. But according to Kornblich, Dr. Brown, and the physical therapy records, which is the manifest way to the evidence, no, I think that he was improving. Well, don't we really have a claimant here who, you know, in pain is subjective, there's no objective measure, we all agree to that, but who is doing this and is not getting free of the pain, that the onset of the pain occurred after the incident, which we are not disputing. Right. And is left with an alternative, I've got to try something else? Sure. The alternative, I've got to try something else, should not have been an award by the commission for surgery based upon the manifest way to the evidence. Even Dr. Kornblich said he needs to undergo, get his life back, do some aerobic exercises at home, I think. Well, aerobic day, I'll tell you to stop smoking and do aerobic exercises, no matter what, okay, but focusing on the injury, okay, where is it that continuation of the program that he is engaged in, okay, this conservative treatment is going to result in the eradication of this condition, is there any evidence there? I believe, again, the evidence is in the therapy records, he went from sedentary to light medium, I believe the evidence is in the injections, after the second injection, he testified that he had seven days of relief following that second injection. I believe that he, again, with Dr. Kornblich's review, feels that his subjective I believe that the conservative treatment may have worked, but, again, I think the commission reacted and followed along the same lines of saying, injury, pain, pain, pain, surgery, we find it compensable. I think you do need to look at the totality of the evidence and consider all of the medical and consider the objective findings. All right, counsel, you have time on rebuttal. Thank you. Counsel, please. Good morning, Your Honors. Ms. Ciciretti, Kenneth Peters on behalf of Mr. Kryan. I respectfully agree with the judge that this is the situation, manifest way to the evidence, the question of which doctor do you believe. We have, as Ms. Ciciretti admitted, an undisputed accident, a problem with his  neck that never evades, a problem with his neck that by the evidence of his treating surgeon necessitates surgery, a problem with his neck that still leaves him with limited motion of his neck, documented not only by the petitioner's testimony, but also the medical records and the physical therapy records. Given your argument, due respect, is citing evidence that the claimant was improving with conservative treatment, had not yet exhausted all noninvasive treatment as recommended by Brown and Kornblack. So what's your response to that? Well, I think he did exhaust the conservative treatment that had been recommended by Dr. Brown. Dr. Brown suggested epidural injections. He underwent the epidural injections. He also underwent an extensive course of physical therapy after Brown's appointment. Dr. Brown's appointment was in January. His case proceeded to trial in April. So there was another four months' worth of conservative care that he underwent. But Brown didn't actually rule out surgery, did he? Absolutely not. Dr. Brown diagnosed what Dr. Kalski diagnosed. This man had mechanical neck pain. What we have is a very simple causal connection situation. We have absolutely no evidence that this individual had any prior problems with his neck, no evidence of any prior treatment to his neck, no intervening accident for the respondent to hang their head on, that this somehow disrupted the causal connection situation. We have a clear aggravation of a preexisting cervical neck condition that manifested itself right after this accident and continued unabated to the time of arbitration. So how we can argue that there was no proof or that the decision of the Industrial Commission that there was no causal connection based upon that is, I think, certainly not appropriate. Well, are they arguing causal connection? I mean, or is it really maybe the argument today basically is the necessity of this particular surgery? All right. If we were to say that, fine. Let's go directly to the necessity for the surgery that's been recommended. As has been pointed out, we have a treating doctor. We have a treating orthopedic surgeon. We have a treating orthopedic surgeon, by the way, Your Honors, that is taken from a panel of doctors, a panel of doctors that's agreed upon by the respondent and the collective bargaining agreement for this individual. That's Dr. Kowski. That's contained in the record. That's how Mr. Kryan got to Dr. Kowski. And we have an uninterrupted, continuous course of physical therapy, excuse me, of conservative care. At what point in time does conservative care stop? Obviously, at this point in time, the Commission felt he'd had enough physical therapy, he'd had enough injections. And at this point in time, we have a treating physician of the opinion that he needs a surgery. We don't have, the only doctor who is in disagreement with that is Dr. Kornblatt, who was examined, excuse me, who was hired and examined the petitioner on behalf of the respondent. So I think we're standing here arguing about a situation where there's no finding, there's no opinion in any of this record that Mr. Kryan is a malingerer or that he doesn't have justification for the ongoing complaints of pain that he has. We have a situation where it's well documented what his condition has been. We even have Dr. Kornblatt agreeing that this individual has problems with his cervical motion. And clearly the surgery that's being recommended is to treat that problem with his neck. Questions? Thank you, Counsel. Rebuttal? Thank you, Your Honors. I just would like to make a comment that causation, TTD and medical are in dispute. And we respond and ask that you reverse the Commission decision. But I do want to comment briefly on the fact that the surgery is meant to help petitioner's condition. Specifically in the last paragraph of Dr. Brown's report, he indicates, and I quote, today I recommend he pursue all reasonable conservative treatment before considering an anterior decompression infusion at C5-6. If it comes to surgery, perhaps we should have him undergo an EMG of his neck and upper extremities to rule out carpal tunnel syndrome, since if he has that problem, surgery will not affect it. Again, it's Respondent's position that you need to look at the totality of the evidence. It's not Dr. Kautsky versus Dr. Kornblatt. The totality of the evidence lends itself to the surgery not being necessary. Did the claimant have the surgery shortly after Dr. Brown gave his opinion? Or did the claimant have a series of conservative treatments you've alluded to before he had the surgery? Didn't he have treatments after Brown's opinion? He did. He underwent the cervical epidural injections. And so isn't that relevant? It is relevant. And he made progress after that second one, which is extremely relevant to this case, to show that he was improving. Seven days' worth, I believe, is his testimony of improvement following that second epidural injection. Any questions? Thank you, counsel. Thank you. The court will take the matter under advisement for disposition.